No. 22-50262

## In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

JEREMY TRAVIS PAYNE,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Central District of California
The Honorable Percy Anderson, Presiding
D.C. No. 5:22-CR-00054-PA-1

## Appellant's Petition for Rehearing / Rehearing En Banc

CUAUHTEMOC ORTEGA
Federal Public Defender
CAROLINE S. PLATT
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
213-894-1628
caroline_platt@fd.org

*Counsel for Defendant-Appellant
Jeremy Payne*

INTRODUCTION ................................................................................ 1

STATEMENT ..................................................................................... 3

REASONS FOR GRANTING THE PETITION ..................................... 11

    I.    The Panel's Decision Conflicts with Both Supreme
        Court and Other Precedent ..................................................... 11

        A.    The Panel's Fifth Amendment ruling is
               inconsistent with *Hubbell* and *Fisher*. ......................... 12

        B.    The disclosure of one's device passcode to the
               police is testimonial. ...................................................... 14

        C.    The use of one's device passcode to provide an
               unlocked device to the police is testimonial. ............... 15

        D.    The use of one's biometrics to provide an
               unlocked device to the police is testimonial. ............... 17

    II.    This Case Involves An Exceptionally Important
        Constitutional Question ......................................................... 22

CONCLUSION .................................................................................. 23

CERTIFICATE OF COMPLIANCE RE PETITION LENGTH ............. 24

APPENDIX ....................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*State v. Andrews,*
234 A.3d 1254 (N.J. 2020) .................................................. 14

*In re Application for a Search Warrant,*
236 F.Supp.3d 1066 (N.D.Ill. 2017) ................................... 19

*Commonwealth v. Davis,*
220 A.3d 534 (Pa. 2019) ..................................................... 14

*State v. Diamond,*
905 N.W.2d 870 (Minn. 2018) ............................................ 19

*Doe v. United States,*
487 U.S. 201 (1988) ............................................................ 12

*Fisher v. United States,*
425 U.S. 391 (1976) ..................................................... 12, 19

*Commonwealth v. Gelfgatt,*
11 N.E.3d 605 (Mass. 2014) ............................................... 16

*In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011,*
670 F.3d 1335 (11th Cir. 2012) .......................................... 15

*Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cty.,*
542 U.S. 177 (2004) ............................................................ 12

*United States v. Hubbell,*
530 U.S. 27 (2000) .................................................. 12, 13, 17

*United States v. Maffei,*
No. 18-CR-00174-YGR-1, 2019 WL 1864712 (N.D.Cal. Apr. 25, 2019) ................................................................... 14

*United States v. Oloyede,*
933 F.3d 302 (4th Cir. 2019) ............................................. 17

## TABLE OF AUTHORITIES

**Page(s)**

*United States v. Payne,*
 99 F.4th 495 (9th Cir. 2024) ................................................................ 1

*State v. Pittman,*
 479 P.3d 1028 (Or. 2021) .................................................................... 19

*People v. Ramirez,*
 316 Cal. Rptr. 3d 520 (Ct. App. 2023) ............................................... 19

*In re Residence in Oakland, Cal.,*
 354 F.Supp.3d 1010 (N.D. Cal. 2019) ........................................... 18, 20

*Matter of Search of [Redacted] Washington, D.C.,*
 317 F.Supp.2d (D.D.C. 2018) ............................................................. 19

*Seo v. State,*
 148 N.E.3d 952 (Ind. 2020) ........................................................... 15, 16

*People v. Sneed,*
 2023 IL 127968 .................................................................................. 16

*State v. Valdez,*
 __ P.3d __ (Utah 2023) ....................................................................... 14

*United States v. Wright,*
 431 F.Supp.3d 1175 (D.Nev. 2020) .................................................... 18

## Constitutional Provisions, Statutes, and Rules

U.S. Const. amend. V ................................................................... *passim*

18 U.S.C. § 841 ...................................................................................... 8

Fed. R. App. P. 35 ..................................................................... 1, 2, 11, 22

Fed. R. App. P. 40 .............................................................................. 3, 22

9th Cir. R. 40-1(c) ................................................................................. 3

## INTRODUCTION

Appellant Jeremy Payne respectfully petitions for rehearing en banc of *United States v. Payne*, 99 F.4th 495 (9th Cir. 2024). This proceeding involves a question of exceptional importance, and the panel decision conflicts with decisions of the United States Supreme Court. Fed. R. App. P. 35(b)(1)(A), (B).

This case presents an issue of first impression among the federal courts of appeals: whether the police's forcible use of detainee biometrics to open a cell phone is "testimonial" within the meaning of the Fifth Amendment. There is already a split among district courts nationwide and, notably, among state supreme courts as well. In affirming the denial of the motion to suppress, the Panel disregarded caselaw protecting testimonial communications under the Fifth Amendment right not to be a witness against oneself, and issued a published opinion in conflict with Supreme Court precedent, and that of state courts of last resort.

The Court, sitting en banc, should rehear this case for three reasons. *First*, the Panel erroneously concluded that police forcibly using a detainee's biometrics to unlock his cell phone was not a

violation of the Fifth Amendment because biometric unlocking was not "testimonial" – that is, that it did not communicate information to the police. *Second*, the Court should grant rehearing because this case involves a question of exceptional importance. Fed. R. App. P. 35(b)(1)(B). The Panel's Fifth Amendment holding, the first of its kind among the federal courts of appeals, will control not only cases involving persons on parole, but cases involving *everyone* in the Ninth Circuit.

Finally, the Panel's decision is wrong. It overlooks or misapprehends material points of law and fact, leading to an incorrect result. As lower federal courts and state supreme courts have recognized, the police's forcible unlocking of a cell phone by way of biometrics conveys information – apart from any passcode – that qualifies as testimonial. For example, if one's biometrics unlock a phone, that fact conveys that the person has previously possessed the phone, necessarily, to set up the biometric unlocking; the act of unlocking the phone thus "communicates some degree of possession, control, and authentication of the cellphone's contents."

For these reasons, the Court should grant rehearing en banc.[1] If the Court doesn't rehear this case en banc, the panel should grant rehearing to the extent it overlooked or misapprehended the points made in this petition. Fed. R. App. P. 40(a).

## STATEMENT

1. California Highway Patrol officers conducted a traffic stop on a gold Nissan driven by Jeremy Payne late one morning in November 2021 because they perceived it to have darker window tint than is lawful.[2] Payne truthfully revealed that he was on parole.[3] After confirming parole status, the CHP officers ordered Payne out of the car, searched him, and searched the car.[4] They found no contraband, but did find in his pockets $1,270 cash and a key ring with several keys, including a key to a BMW.[5]

---

[1] A copy of the Court's published opinion is included in an appendix ("App.") to this petition. 9th Cir. R. 40-1(c). "AOB" refers to Appellant's Opening Brief (Doc. 8), "ER" refers to Appellant's Excerpts of Record (Doc. 9), "GAB" refers to the Government's Answering Brief (Doc. 22), and "ARB" refers to Appellant's Reply Brief (Doc. 33).

[2] App.6; ER-10, 45-46, 50.

[3] App.6.

[4] App.6.

[5] App.6.

An officer asked Payne if he had a phone.[6] Payne responded, and the phone was where Payne said it would be.[7] A CHP officer retrieved it and asked Payne for the passcode.[8] Payne then denied the phone was his and declined to provide the passcode.[9] The CHP officer then forcibly grabbed Payne's thumb and successfully used it to unlock the phone via a built-in biometric unlocking feature.[10]

The digital contents of the phone listed Payne as the owner.[11] Inside the phone, police found a video with a date of that same day, showing the inside of a room with what the officer believed to be "a large amount of U.S. currency, several bags of blue pills (suspected to be fentanyl), and a gold-colored money counting machine."[12] A second video showed the outside of a residence, and an individual the officer suspected to be Payne was stating: "life is good in Palm Desert" and "I got the Beamer out front," referring to a parked BMW vehicle shown in the video. The CHP officers then used a pin drop they found in a map

---

[6] App.6.
[7] App.6.
[8] App.6.
[9] App.7.
[10] App.7.
[11] App.7.
[12] App.7.

application in the phone to drive Payne to the location of the maps pin. There, they found a BMW parked on the street, and a house that looked like the one in the video.[13] Payne's keys opened the house and the BMW.[14]

Before obtaining a search warrant, officers entered the home and conducted a search they described as a "security sweep."[15] During this initial search of the home, officers observed in plain view several bags of blue pills they suspected of being fentanyl and a money-counting machine, consistent with what they had observed in the first video on Payne's cell phone.[16] At that point, the police obtained a search warrant for the house.[17] They then searched the house again and seized the drugs and cash.[18]

2. A grand jury in the Central District of California returned an indictment against Payne. He was charged with three counts of

---

[13] App.7-8.

[14] App.8.

[15] App.8. The government conceded that this search was not valid under the "protective sweep" doctrine. GAB.50. The Panel declined to address the legality of the sweep, but concluded that the later-obtained search warrant was valid even after excising those facts. App.35.

[16] App.8.

[17] ER-12, 59-67.

[18] App.9.

5

possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841.[19]

Payne filed a motion to suppress evidence.[20] In sum, Payne argued that: the police's search of the cell phone violated the Fifth Amendment; the police violated *Miranda*; the police's search of the cell phone violated the Fourth Amendment; the police's search of the house on El Cortez Way was the fruit of the illegal searches of the phone; the search of the house on El Cortez Way itself violated the Fourth Amendment; and the search warrant was based on illegally-obtained evidence.[21]

The government opposed.[22] It argued that all the searches fell within various Fourth Amendment exceptions. As relevant here, the government argued that the officers' forcible use of Payne's biometrics to access the digital contents of the phone did not implicate the Fifth Amendment because forced biometric opening of a cell phone is not "testimonial."[23]

---

[19] ER-17-21.
[20] ER-22.
[21] ER-24.
[22] ER-71-97.
[23] ER-84-85.

Notably, the parties agreed that if the searches of Payne's phone violated his constitutional rights, all the evidence from the house must also be suppressed, because the searches of the phone precipitated the searches of the house and thus the evidence found at the house was fruit of the poisonous tree.[24]

3. The district court orally denied Payne's motion to suppress at the motions hearing.[25] As to the Fifth Amendment issue, the district court found that the search of Payne's cell phone did not violate the Fifth Amendment, briefly stating: "The use of the defendant's fingerprint to access the contents of the cell phone does not constitute a violation of the Fifth Amendment." ER-13. Inaccurately summarizing the parole conditions, the district court stated that the "parole conditions mandated that he provide access to a cell phone ***using his fingerprint*** and the use of that fingerprint was not a testimonial statement."[26]

---

[24] GAB 43-44.

[25] ER-108-32 (transcript).

[26] ER-13 (emphasis added). As a factual matter, the district court clearly erred in stating that Payne's "parole conditions mandated that he provide access to a cellphone using his fingerprint." ER-13. The parole conditions did not require Payne to provide a fingerprint or other

The district court then concluded that the Fifth Amendment did not apply to the officers' forcible application of Payne's fingerprint to open his phone.[27] The district court opined that "whether the officer used the defendant's thumb or the defendant voluntarily provided a password or his thumb does not change the analysis. As to the handling of his thumb, that's no more intrusive than taking blood from a person or taking somebody's fingerprints."[28]

Not relevant to this petition, the district court also rejected Payne's other arguments for suppression.[29] Payne later entered a conditional plea to violating 18 U.S.C. § 841, while reserving the right to appeal the denial of his suppression motion.[30] The district court sentenced Payne to serve 144 months in prison, to be followed by five years of supervised release.[31]

---

biometric means of access; only that he provide a "pass key/code." ER-56.

[27] ER-14.
[28] ER-14.
[29] ER-15-16.
[30] ER-133-50.
[31] ER-4.

4. Following briefing and oral argument, this Court affirmed.[32] As relevant here, the Panel held that the officers' forced use of Payne's biometrics to open his phone did not fall within the meaning of "testimonial" for purposes of the Fifth Amendment.[33] The Panel correctly noted that the forced biometric unlocking was both compelled and incriminating, the other two requirements under the Fifth Amendment.[34] The Panel misapprehended, however, that forced biometric unlocking of a phone is not as simple as the "compelled physical acts" cases upon which it relied, because unlike simply put one's fingerprint on a fingerprint card, biometric unlocking of a phone itself *conveys information* to the police about one's relationship to the phone in a way that simple fingerprinting does not.

Payne argued that if one's biometrics unlock a phone, that conveys to the police that one has previously possessed the phone – the act instantly concedes "that the phone was in the possession and control of the suspect, and authenticates ownership or access to the phone and all

---

[32] App.1-35.

[33] App.32.

[34] App.22-23.

of its digital contents."[35] The Panel instead relied on cases that assert to the contrary: "responding to the argument that 'if the device unlocks, then the incriminating inference is that the person had possession or control of the device,' these courts note that such a line of analysis improperly conflates the incrimination prong with the testimonial prong."[36] The Panel instead relied on cases that "ultimately conclude that biometric unlock cases are no different than other physical trait cases, like subjecting an individual to fingerprinting or drawing a person's blood, because the acts at issue do not themselves communicate anything."[37]

This holding was in error. The Panel misapprehended that an implicit communication can be both incriminating and testimonial, and the unlocking of a phone by way of biometrics can be both. In fact, while it may or may not be incriminating, the biometric opening of a phone is always testimonial, because it implicitly conveys previous possession and control over the device and its contents – whether or not

---

[35] App.27 (quoting *In re Residence in Oakland, Cal.*, 354 F.Supp.3d 1010, 1016 (N.D. Cal. 2019)) ("*Oakland*").

[36] App.28 (citing cases).

[37] App.28 (cleaned up).

incriminating. The relationship between the detainee and the device is confirmed by the act of opening the phone – that testimonial aspect is true whether the contents of the phone are incriminating, such as pictures of drugs and weapons, or whether the phone only contains pictures of puppies and rainbows. The implicit communication, regardless, is testimonial every time: biometric opening conveys the fact of one's prior possession and control of the phone and its contents. Whether or not incriminating – depending on the contents of the phone – that is always testimonial because the action implicitly conveys information to the police.

The Panel got this case, one of exceptional importance and the first on this issue among the federal courts of appeals, wrong. The Court should rehear this case en banc.

## REASONS FOR GRANTING THE PETITION

## I. The Panel's Decision Conflicts with Both Supreme Court and Other Precedent.

The Panel's Fifth Amendment ruling conflicts with decisions of the Supreme Court and lower federal courts, as well as state supreme courts. Rehearing is therefore necessary to secure and maintain uniformity of decisions. Fed. R. App. P. 35(a)(1), (b)(1)(A).

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cty.*, 542 U.S. 177, 189 (2004). To be a testimonial communication, an act must "relate a factual assertion or disclose information." *Doe v. United States*, 487 U.S. 201, 210 (1988). Under the act of production doctrine, a purely physical act may nonetheless be testimonial because of what it implicitly communicates "wholly aside from the contents" of the thing produced. *Fisher v. United States*, 425 U.S. 391, 410 (1976).

The Panel held the officers' use of Payne's finger to unlock his cell phone did not violate the Fifth Amendment because it was not testimonial. That conclusion was in error.

### A. The Panel's Fifth Amendment ruling is inconsistent with *Hubbell* and *Fisher*.

1. The Panel's ruling conflicts with the Supreme Court's decision in *United States v. Hubbell*, 530 U.S. 27 (2000). In *Hubbell*, the government served the respondent with a subpoena for various categories of documents, in response to which he produced extensive

12

documents. *Id*. at 31. The Court concluded that the act of producing the documents was "testimonial" insofar as it revealed the existence and location of the documents and the respondent's control over them. *Id*. at 40-45.

Just the same, the act of providing access to the contents of a digital device by way of one's biometrics "reveal[s] the existence and location of the documents and the respondent's control over them." There is no material difference between *Hubbell* and the question presented here.

There are three categories of cases relating to the interplay of access to digital devices and the Fifth Amendment: (1) cases involving the conveyance of one's passcode to the police; (2) cases in which one uses a passcode to open the device and provide the unlocked/unencrypted device to the police; (3) cases in which one is compelled to open the device with one's biometrics, such as a fingerprint or facial recognition. All three categories satisfy the testimonial requirement of the Fifth Amendment.

**B.    The disclosure of one's device passcode to the police is testimonial.**

One category of cases involves giving one's passcode itself to law enforcement. Appellate courts so far agree that this is testimonial, in part because of the message or contents of the passcode itself: one's passcode could be a string of numbers and/or letters (that may have meaning), which is testimonial. The New Jersey Supreme Court, for example, held that communicating a passcode is a "testimonial act of production." *State v. Andrews*, 234 A.3d 1254, 1273 (N.J. 2020). "Communicating or entering a passcode," the court reasoned, "requires facts contained within the holder's mind—the numbers, letters or symbols composing the passcode." *Id.*; *see also Commonwealth v. Davis*, 220 A.3d 534, 548 (Pa. 2019) (concluding that "the disclosure of a password" is "testimonial"); *State v. Valdez*, __ P.3d __, 2023 WL 8635197, at *12 (Utah 2023) (holding that compelled statement of passcode to detective is testimonial); *United States v. Maffei*, No. 18-CR-00174-YGR-1, 2019 WL 1864712, at *6 (N.D.Cal. Apr. 25, 2019) (concluding that forcing defendant to provide cellphone passcode was testimonial, but did not violate Fifth Amendment because it was not compelled).

14

But as in *Hubbell*, and as will be discussed next, there is also an act of production that is testimonial – separate and apart from the testimonial aspect of the passcode (as a word or statement) itself.

**C.  The use of one's device passcode to provide an unlocked device to the police is testimonial.**

The second category of cases involves compelling a person to *enter* or *use* their own passcode to provide access to the digital contents of a device, but without having to convey the passcode itself to law enforcement. *See, e.g.*, *Seo v. State*, 148 N.E.3d 952, 953 (Ind. 2020). This unlocks the phone so law enforcement can then access its contents.

The majority of appellate courts that have confronted this issue have held that compelling one to use a passcode to provide access to the contents of a locked or encrypted device is testimonial. On one side is the Eleventh Circuit and at least three state supreme courts, all of which have concluded that entering a passcode (or an equivalent act such as decrypting data on a device) is testimonial. *See In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1346 (11th Cir. 2012) ("We hold that the act of Doe's decryption and production of the contents of the hard drives would sufficiently implicate the Fifth Amendment privilege. We reach this holding by

15

concluding that (1) Doe's decryption and production of the contents of the drives would be testimonial, not merely a physical act"); *People v. Sneed*, 2023 IL 127968, ¶ 78, *cert. denied sub nom. Sneed v. Illinois*, 144 S.Ct. 1012 (2024) ("We find that compelling the act of entering a passcode to a cell phone is testimonial to the extent that performing the act implicitly asserts that the person entering it has the ability to unlock the phone."); *Seo*, 148 N.E.3d at 955 ("Giving law enforcement an unlocked smartphone communicates to the State, at a minimum, that (1) the suspect knows the password; (2) the files on the device exist; and (3) the suspect possesses those files. This broad spectrum of communication is entitled to Fifth Amendment protection unless the State can show that it already knows this information, making it a foregone conclusion."); *Commonwealth v. Gelfgatt*, 11 N.E.3d 605, 614 (Mass. 2014) ("defendant's act of entering an encryption key in the computers seized by the Commonwealth would appear, at first blush, to be a testimonial communication that triggers Fifth Amendment protection. By such action, the defendant implicitly would be acknowledging that he has ownership and control of the computers and

their contents. This is not simply the production of real or physical evidence like a blood sample or a handwriting exemplar.").[38]

The act of producing access to the digital contents of a device, these courts hold, is testimonial because of what the act of producing access to the digital items conveys to law enforcement about one's relationship to that digital data – that is, that one possesses it, one controls it, the digital files exist, and the like. This category of cases are like *Hubbell*, supra. They are also like the next category of cases (and this case). And the Panel's reasoning conflicts with all of them.

### D. The use of one's biometrics to provide an unlocked device to the police is testimonial.

The third category of cases is exactly like this one, where law enforcement compels the use of one's biometrics to open a device and thus to provide access to its digital contents. The reasoning of a biometrics-access case is no different than the second category of cases, supra, whereby one is compelled to use one's own passcode – but not to disclose it – to provide access to the contents of a digital device.

---

[38] Alone on the other side of this issue is the Fourth Circuit, which suggested in dicta that entering a passcode is not testimonial. *United States v. Oloyede*, 933 F.3d 302, 309 (4th Cir. 2019).

Whether one uses a passcode, or whether one uses one's biometrics, to open a digital device, the act of providing access to the contents of a device conveys information to the police about you and your relationship to that device, and its digital contents.

The Panel concluded otherwise, stating:

> we hold that the compelled use of Payne's thumb to unlock his phone (which he had already identified for the officers) required no cognitive exertion, placing it firmly in the same category as a blood draw or fingerprint taken at booking. The act itself merely provided CHP with access to a source of potential information, much like the consent directive in *Doe*. The considerations regarding existence, control, and authentication that were present in *Hubbell* are absent or, at a minimum, significantly less compelling in this case. Accordingly, under the current binding Supreme Court framework, the use of Payne's thumb to unlock his phone was not a testimonial act and the Fifth Amendment does not apply.

App.32.

Several state supreme courts and lower federal courts have come to the opposite conclusion as the Panel. *See, e.g.*, *Oakland,* 354 F.Supp.3d at 1015; *United States v. Wright*, 431 F.Supp.3d 1175, 1187 (D.Nev. 2020) *aff'd,* No. 20-10303, 2022 WL 67341 (9th Cir. Jan. 6, 2022) ("unlocking a phone with your face equates to testimony that you

have unlocked the phone before, and thus you have some level of control over the phone."); *In re Application for a Search Warrant*, 236 F.Supp.3d 1066, 1073 (N.D.Ill. 2017) (observing that by providing a biometric passcode to a cellphone, "a suspect is testifying that he or she has accessed the phone before, at a minimum, to set up the fingerprint password capabilities, and that he or she currently has some level of control over or relatively significant connection to the phone and its contents"); *State v. Pittman*, 479 P.3d 1028, 1040-43 (Or. 2021) (unlocking phone using biometrics is testimonial); *but see, e.g.*, *Matter of Search of [Redacted] Washington, D.C.*, 317 F.Supp.2d, 523 (D.D.C. 2018) (finding use of biometrics non-testimonial); *State v. Diamond*, 905 N.W.2d 870, 875 (Minn. 2018) (same); *People v. Ramirez*, 316 Cal. Rptr. 3d 520, 544–50 (Ct. App. 2023) (same).

Under the act of production doctrine, a purely physical act may nonetheless be testimonial because of what it communicates "wholly aside from the contents" of the thing produced. *Fisher*, 425 U.S. at 410. That is true of forced biometric unlocking of a digital device, just as with one's entry of one's passcode, supra.

These cases are not like the compelled physical act cases, contrary to the Panel's conclusion.[39] That is, as one court explained, "requiring someone to affix their finger or thumb to a digital device is fundamentally different than requiring a suspect to submit to fingerprinting." *Oakland*, 354 F.Supp.3d at 1015. The court reasoned that using a finger- or thumb-print "to unlock a device indicates that the device belongs to a particular individual," thus constituting a concession that the phone was in the individual's "possession and control" and that the individual owns or has "*access to all of its digital contents.*" *Id.* at 1016 (cleaned up) (emphasis added). Thus these cases are act of production cases, not compelled physical act cases like the blood draw or taking fingerprint cases.

The Panel rejected this argument, concluding that "this line of analysis conflates what is incriminating with what is testimonial." But the Panel's reasoning is faulty, and led to an incorrect holding. Payne argued that if one's biometrics unlock a phone, that conveys to the police information about one's relationship to the phone, that one has

---

[39] App.31.

previously possessed the phone, and its contents.[40] The act of production instantly concedes "that the phone was in the possession and control of the suspect, and authenticates ownership or access to the phone and all of its digital contents."[41] That is true regardless of whether the digital data is incriminating.

The Panel instead relied on cases that assert to the contrary, stating: "responding to the argument that 'if the device unlocks, then the incriminating inference is that the person had possession or control of the device,' these courts note that such a line of analysis improperly conflates the incrimination prong with the testimonial prong."[42] "They ultimately conclude that biometric unlock cases are no different than other physical trait cases, like subjecting an individual to fingerprinting or drawing a person's blood, because the acts at issue do not themselves communicate anything."[43] But the ability to unlock a phone does itself conveys information, making it testimonial.

---

[40] AOB 33-36.

[41] App.27 (quoting *Oakland*, 354 F. Supp. 3d at 1016).

[42] App.28 (citing cases).

[43] App.28 (cleaned up).

The Panel's holding was in error, significantly diminishes the Fifth Amendment rights of people in the Ninth Circuit, and overlooked or misapprehended material points of fact and law. Fed. R. App. P. 40(a)(2). Absent these errors, the Panel would have reversed the denial of Payne's suppression motion and vacated his conviction.

## II. This Case Involves An Exceptionally Important Constitutional Question.

The Panel's decision involves exceptionally important questions about the Fifth Amendment and its application to digital devices including cell phones, ubiquitous in modern life. Rehearing is needed for this reason. Fed. R. App. P. 35(a)(2), (b)(1)(B).

This is the first case on this Fifth Amendment issue to be decided by a federal court of appeals – regardless of which of the three categories above (giving the passcode, unlocking by passcode, or biometric unlocking) one considers. Approximately 97% of people in the United States have a cell phone.[44] This issue is of exceptional

---

[44] *See* Pew Research Mobile Fact Sheet (Jan. 31, 2024) (https://www.pewresearch.org/internet/fact-sheet/mobile/#:~:text=The%20vast%20majority%20of%20Americans,smartphone%20ownership%20conducted%20in%202011.)

constitutional and practical importance to the millions of residents of the Ninth Circuit.

## CONCLUSION

For the foregoing reasons, the petition for panel rehearing and rehearing en banc should be granted.

Dated: July 1, 2024

Respectfully submitted,

CUAUHTEMOC ORTEGA
FEDERAL PUBLIC DEFENDER

By: s/ *Caroline S. Platt*
     Caroline S. Platt
     Deputy Federal Public Defender

     *Counsel for Defendant-Appellant*
     *Jeremy Payne*

## CERTIFICATE OF COMPLIANCE

Pursuant to Cir. R. 35-4(a) and 40-1(a), I certify that the foregoing petition is in compliance with Fed. R. Cr. P. 32(c) and contains approximately 4,147 words (not including the table of contents, the table of authorities, the certificate of compliance re brief length, and the appendix, and including footnotes).

July 1, 2024          _s/ Caroline S. Platt_

Caroline S. Platt
Deputy Federal Public Defender

**APPENDIX**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-50262 |
| *Plaintiff-Appellee*, | D.C. No. 5:22-cr-00054-PA-1 |
| v. | |
| JEREMY TRAVIS PAYNE, AKA Jeramey Travis Payne, | OPINION |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted February 14, 2024
Pasadena, California

Filed April 17, 2024

Before: Richard C. Tallman and Consuelo M. Callahan,
Circuit Judges, and Robert S. Lasnik,* District Judge.

Opinion by Judge Tallman

---

* The Honorable Robert S. Lasnik, United States District Judge for the
Western District of Washington, sitting by designation.

## SUMMARY[**]

---

### Criminal Law

The panel affirmed the district court's denial of Jeremy Travis Payne's motion to suppress evidence.

Payne, a California parolee, was arrested and charged with possession with intent to distribute fentanyl, fluorofentanyl, and cocaine. After the district court denied his motion to suppress evidence of these crimes that California Highway Patrol officers had recovered from a house in Palm Desert, California, he entered a conditional guilty plea to possession of fentanyl with intent to distribute.

The panel held that the CHP officers did not violate the Fourth Amendment in their search, during a traffic stop, of Payne's cell phone, made possible by the officers' forced use of his thumb to unlock the device. The panel held that, despite the language of a special search condition of Payne's parole, requiring him to surrender any electronic device and provide a pass key or code, but not requiring him to provide a biometric identifier to unlock the device, the search was authorized under a general search condition, mandated by California law, allowing the suspicionless search of any property under Payne's control. The panel concluded that any ambiguity created by the special condition, when factored into the totality of the circumstances, did not increase Payne's expectation of privacy in his cell phone to render the search unreasonable under the Fourth Amendment. The panel further held that the search of the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

cell phone was not unreasonable on a theory that it violated California's prohibition against arbitrary, capricious, or harassing searches. In addition, the search of Payne's photos, videos, and maps on his cell phone did not run afoul of *Riley v. California*, which held that officers cannot search the contents of an individual's cell phone incident to their arrest, because *Riley* does not apply to parole searches of a cell phone.

The panel held that the CHP officers did not violate Payne's Fifth Amendment privilege against self-incrimination when they compelled him to unlock his cell phone using his fingerprint. Payne established that the communication at issue was compelled and incriminating. The panel held, however, that the compelled use of a biometric to unlock an electronic device was not testimonial because it required no cognitive exertion, placing it in the same category as a blood draw or a fingerprint taken at booking, and merely provided the CHP with access to a source of potential information. Accordingly, the Fifth Amendment did not apply.

The panel held that there was sufficient probable cause to support issuance of a search warrant without regard to observations CHP officers made during a challenged protective sweep of the Palm Desert House.

4                                    USA v. PAYNE

## COUNSEL

Caroline S. Platt (argued), Assistant Federal Public
Defender; Cuauhtemoc Ortega, Federal Public Defender;
Federal Public Defender's Office, Los Angeles, for
Defendant-Appellant.

Haoxiaohan H. Cai (argued), Assistant United States
Attorney, General Crimes Section; Bram M. Alden,
Assistant United States Attorney, Chief, Criminal Appeals
Section; E. Martin Estrada, United States Attorney; United
States Department of Justice, Office of the United States
Attorney, Los Angeles, California, for Plaintiff-Appellee.

## OPINION

TALLMAN, Circuit Judge:

Appellant Jeremy Travis Payne was a California parolee
when he was arrested and charged with three counts of
possession with intent to distribute fentanyl, fluorofentanyl,
and cocaine. After the district court denied Payne's motion
to suppress evidence of these crimes recovered from a home
in Palm Desert, California, Payne entered a conditional
guilty plea to possession of fentanyl with intent to distribute
at least 40 grams in violation of 21 U.S.C. § 841(a)(1),
(b)(1)(B)(vi). On appeal, Payne challenges the district
court's denial of his motion to suppress, arguing that
California Highway Patrol ("CHP") officers violated his
Fourth and Fifth Amendment rights.

                                I

In November 2018, Payne was arrested for assault with
a deadly weapon on a peace officer, in violation of Cal. Penal
Code § 245(c).     He was sentenced to three years
imprisonment and later released on parole. On September
23, 2020, Payne signed a one-page "Notice and Conditions
of Parole" document and a separate, three-page "Special
Conditions of Parole" document. Pursuant to Cal. Penal
Code § 3067(b)(3) and 15 Cal. Code Regs. § 2511(b)(4),
Payne's Notice and Conditions of Parole included the
following condition ("general search condition")[1]:

> You, your residence, and any property under
> your control are subject to search or seizure
> by a probation officer, an agent or officer of
> the California Department of Corrections and
> Rehabilitation, or any other peace officer, at
> any time of the day or night, with or without
> a search warrant, with or without cause.

Payne's Special Conditions of Parole included a more
detailed condition ("special search condition") concerning
electronic devices:

> You shall surrender any digital/electronic
> device and provide a pass key/code to unlock
> the device to any law enforcement officer for
> inspection other than what is visible on the
> display    screen.     This    includes    any

---

[1] This general search condition is "mandated as a term of every parolee's
release" in the State of California. *People v. Delrio*, 259 Cal. Rptr. 3d
301, 305 (Ct. App. 2020); *see People v. Schmitz*, 288 P.3d 1259, 1264–
65 (Cal. 2012).

> digital/electronic device in your vicinity.
> Failure to comply can result in your arrest
> pending further investigation and/or
> confiscation of any device pending
> investigation.

On November 3, 2021, CHP officers Coddington and
Garcia—who were both assigned to the Coachella Valley
Violent Crime Gang Taskforce—were patrolling an area in
Desert Hot Springs, California. They saw a gold Nissan with
what they perceived to be unlawfully tinted front windows
and initiated a traffic stop for a suspected violation of Cal.
Veh. Code § 26708. Officer Coddington approached the
vehicle and asked the driver, Payne, to provide his driver's
license, vehicle registration, and proof of insurance. Officer
Coddington later reported that Payne was "extremely
nervous," "trembling as he fumbled for the documents,"
"sweating profusely," and "stammering when he spoke."
Payne informed the officers that he was on California parole.
After confirming Payne's California parole status with
Riverside County Sheriff's Dispatch, Officer Coddington
asked Payne and his female passenger to get out of the car.
Payne was handcuffed and eventually detained in the back
of a squad car.

Officers searched Payne's person pursuant to his parole
conditions and found in his pockets $1,270 cash and a key
ring with several keys, including a key to a BMW. After
searching the vehicle, Officer Coddington asked Payne if he
had a phone. Payne responded that "his phone was in the
driver's door panel and was green in color." The phone was
where Payne said it would be. Officer Coddington retrieved
it and asked Payne to provide the passcode. Despite
confirming that he had a phone, and informing officers of its

location and color, Payne changed his story and began denying ownership, stating "the phone was not his and he did not have the password."

At this juncture, CHP officers would have been justified under Payne's special search condition in either "confiscati[ng] . . . [the] device" or "arrest[ing] Payne pending further investigation." Instead, Officer Coddington forcibly grabbed Payne's thumb and used it to unlock the phone via a built-in biometric unlocking feature.[2] Once unlocked, Officer Coddington opened the phone's settings and confirmed that Payne's full name was listed in the owner's information section. Next, he began looking through the device's stored media and found two important videos.

The first video was recorded on the phone the same day, November 3, 2021, just three hours before the traffic stop. It showed the inside of a room with what Officer Coddington believed to be "a large amount of U.S. currency, several bags of blue pills (suspected to be fentanyl), and a gold-colored money counting machine." An individual, who Officer Coddington presumed was Payne, could be heard on the video referring to the room as his "office." The second video was taken outside of a residence with a gray-brick wall around the front. Again, an individual, who Officer Coddington presumed was Payne, could be heard saying "life is good in Palm Desert" and "I got the Beamer out

_____

[2] Whether Officer Coddington forcibly used Payne's thumb to unlock the phone or Payne "reluctantly unlocked the cell phone using his thumb print" was disputed before the district court. For the purposes of this appeal, however, the government—both in its answering brief and during oral argument—accepted the defendant's version of the facts, i.e., "that defendant's thumbprint was compelled."

front," referring to a parked BMW vehicle shown in the video.

Finally, Officer Coddington opened the maps application on Payne's cell phone, which showed a pin dropped to a parked vehicle on a street called El Cortez Way in Palm Desert, California, about twenty-five miles away. Despite what Officer Coddington found on the phone concerning the parked car in Palm Desert, Payne insisted that he resided with his mother at her home in Indio, California; Payne's female passenger told officers the same thing in a later interview. Based on what CHP officers found on Payne's person and phone, they drove Payne to the location of the parked car on El Cortez Way.

When the officers arrived, they saw a silver BMW parked in front of a house. The car was registered to Payne and the BMW key recovered from Payne's person unlocked it. Before obtaining a warrant, Officer Coddington walked to the front door of what was marked Unit B and unlocked the door with one of the keys from Payne's keyring. Officers entered the home and conducted what they reported as a "security sweep" to "make sure there was no one inside the residence who could possibly come out of the residence and harm [the officers]." During this initial search of the home, officers observed in plain sight several bags of blue pills they suspected of being fentanyl and a money-counting machine, consistent with what they had earlier observed in the first video on Payne's cell phone.

Officer Coddington then wrote a search warrant application for the house on El Cortez Way. The application listed all the information that Officer Coddington had learned from his search of Payne's cell phone. The application also attested that Officer Coddington:

(1) observed a BMW outside of Payne's residence that the key recovered from Payne's person unlocked; (2) confirmed the BMW was registered to Payne; (3) accessed Unit B with another key on Payne's keyring; and (4) saw several bags of blue pills (suspected to be fentanyl) and a gold money-counting machine during the initial sweep of the residence. Two hours later, a Riverside County Superior Court judge authorized the search warrant.

The search of El Cortez Way under the authority of that warrant was more thorough. Officers found several documents, including pieces of mail, bearing Payne's full name. They also discovered a "white powdery substance" throughout the home and a total of 104.3 grams of blue pills marked "M/30." The pills and powder were later confirmed to be fentanyl, fluorofentanyl, and cocaine. In addition to the drugs, officers recovered a total of $13,992 in cash, a digital scale, the gold money-counting machine, and six cell phones. Payne was arrested following the second search.

On February 23, 2022, a federal grand jury returned an indictment charging Payne with: (1) possession with intent to distribute a mixture and substance containing fentanyl in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(vi); (2) possession with intent to distribute fluorofentanyl in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); and (3) possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). Payne filed a motion to suppress the evidence seized from the house on El Cortez Way on April 25, 2022. He primarily argued that the searches of his phone and the house on El Cortez Way violated his Fourth and Fifth Amendment rights.

The district court denied Payne's motion in an oral ruling on May 24, 2022. The court found that the search of Payne's

cell phone was reasonable under the Fourth Amendment given that Payne was on parole in California and subject to California's standard search conditions that covered his electronic devices. Further, the court determined that the compelled use of Payne's thumb to access the phone was a nontestimonial act, placing it outside of Payne's Fifth Amendment privilege against self-incrimination. The court found no separate Fourth Amendment violation for the first, warrantless search of the house on El Cortez Way for two reasons. First, because the search was justified under Payne's parole conditions and, second, because the search warrant officers later obtained would have still been valid after excising the information included in the warrant application from the protective sweep of the home.

Payne was sentenced on November 7, 2022, to 144 months in prison. After the district court entered final judgment, Payne filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. § 1291.

## II

We begin with Payne's Fourth Amendment challenges to the CHP officers' search of his cell phone. Given Payne raises his Fourth Amendment claim in the context of a challenge to the district court's denial of his motion to suppress, we review the denial of that motion *de novo* and the district court's factual findings for clear error. *United States v. Sullivan*, 797 F.3d 623, 632–33 (9th Cir. 2015).

The general suspicionless search condition in Payne's Notice and Conditions of Parole is mandated by California law. *See* Cal. Penal Code § 3067(b)(3); 15 Cal. Code Regs. § 2511(b)(4). The California Supreme Court held the condition was reasonable under the Fourth Amendment, in large part because parolees, who enjoy only "conditional

freedom," have a significantly diminished expectation of privacy, while the government has a strong interest in assessing parolees' rehabilitation and reentry while simultaneously protecting the public. *People v. Reyes*, 968 P.2d 445, 450–51 (Cal. 1998); *People v. Bryant*, 491 P.3d 1046, 1054 (Cal. 2021) ("[A] warrantless search of a parolee's property or residence . . . is per se reasonable."); *see also United States v. Johnson*, 875 F.3d 1265, 1275 (9th Cir. 2017). The Supreme Court of the United States agreed, upholding suspicionless searches of parolees based on the totality of the circumstances provided they are not "arbitrary, capricious, or harassing." *Samson v. California*, 547 U.S. 843, 856–57 (2006). In the years since *Samson*, we have made clear that suspicionless parolee searches that "compl[y] with the terms of a valid search condition will usually be deemed reasonable under the Fourth Amendment." *United States v. Cervantes*, 859 F.3d 1175, 1183 (9th Cir. 2017).

Our more recent cases have articulated the narrow set of constraints that apply to law enforcement officers conducting suspicionless parole searches. First, the officer conducting the parole search must have probable cause to believe "that the individual to be searched is on active parole, and an applicable parole condition authorizes the search or seizure at issue." *United States v. Estrella*, 69 F.4th 958, 972 (9th Cir. 2023). Second, those searches cannot be "arbitrary, capricious, or harassing." *Id.* (internal quotations and citations omitted); *Reyes*, 968 P.2d at 450; *see* Cal. Penal Code § 3067(d) ("It is not the intent of the Legislature to authorize law enforcement officers to conduct searches for the sole purpose of harassment.").

Payne raises two distinct, yet inexorably entwined, arguments: (1) that the officers on scene during the traffic

stop used "unreasonable means" to unlock his phone considering the language of his special search condition;[3] and (2) that the search was arbitrary, capricious, or harassing.

## A

Payne's unreasonable means argument most closely implicates the principle, from *Estrella*, that officers must have probable cause to believe an individual is on parole and subject to an applicable parole condition that authorizes the search at issue. 69 F.4th at 972. Here, the search at issue is of Payne's phone, made possible by the forced use of Payne's thumb to unlock the device. Payne posits the question of whether CHP officers complied with the precise terms of his parole conditions when they searched his cell phone as a threshold one. In other words, he argues that the parole search exception to the warrant requirement cannot apply when officers do not follow the precise terms or commands of a parole condition. He points to the language in special parole condition number sixty-four for support, which compelled Payne to surrender his cell phone to any law enforcement officer for inspection and "provide [the] pass key/code to unlock the device." It further states that "[f]ailure to comply can result in your arrest pending further investigation and/or confiscation of any device pending

---

[3] Invoking Fed. R. Crim. P. 12, the government argues that Payne forfeited his "unreasonable means" argument because he failed to squarely present it in his motion to suppress. However, Payne's argument centers on the precise language of his parole conditions, which was presented to and analyzed by the district court during the suppression hearing. *See United States v. Magdirila*, 962 F.3d 1152, 1155–57 (9th Cir. 2020). Because Payne's argument does not rely on new facts or wholly distinct legal theories, we decline to deem it forfeited.

investigation." Relying on the condition's plain language, Payne argues that the officers could not use his thumb to unlock his phone when he refused to provide the numerical passcode—their only recourse was to confiscate the device or arrest him pending investigation, as outlined in the special search condition.

Textually, Payne's unreasonable means argument has certain cogency. The special search condition *did not* require Payne to provide a biometric identifier to unlock any electronic devices in his vicinity and it *did* include an express enforcement provision. However, Payne's argument suffers from two fatal flaws. First, it ignores the more general, statutorily mandated search condition included in his—and every California parolee's—Notice of Conditions of Parole. Second, Payne's proposed approach decouples the analysis from the "totality of the circumstances" and "reasonableness" inquiries that form the foundation of our Fourth Amendment jurisprudence, including in the parolee search context. *See, e.g.*, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *United States v. Knights*, 534 U.S. 112, 118 (2001).

While Payne's special search condition addresses electronic devices specifically, his general search condition, mandated by California law, states that "any property under [Payne's] control are subject to search or seizure by . . . any other peace officer, at any time of the day or night, with or without a search warrant, with or without cause." We have before held that California's statutory framework governing the suspicionless search of parolees authorizes officers to conduct warrantless searches of parolees' cell phones. *See Johnson*, 875 F.3d at 1275. The language of California's general search condition, written into all California parole notices, is abundantly clear, putting parolees like Payne on

notice that their person, home, phone, and other belongings may be searched at any time without cause or a warrant. This "clear and unambiguous search condition" serves to "significantly diminish[] [parolees'] reasonable expectation of privacy." *Samson*, 547 U.S. at 852. Thus, under the general search condition of Payne's parole, he did not have an "expectation of privacy that society would recognize as legitimate" in the contents of his cell phone. *Id.* The question then becomes whether the inclusion of the special search condition in any way alters that reality.

In applying Supreme Court precedent governing warrantless parolee and probationer searches, we have acknowledged that officers are generally required to conduct these searches pursuant to valid search conditions. In *United States v. Caseres*, we held that warrantless parole searches do not withstand scrutiny when officers are unaware that § 3067, or a similar parole search statute or condition, applies. 533 F.3d 1064, 1076 (9th Cir. 2008). *Caseres* drew on well-founded concerns that officers could seek to use broad parole search conditions—discovered to apply only after a warrantless search took place—to retroactively justify their actions. *See id.*; *Samson*, 547 U.S. at 856 n.5 ("[A]n officer would not act reasonably in conducting a suspicionless search absent knowledge that the person stopped for the search is a parolee."); *Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005) ("[P]olice officers cannot retroactively justify a suspicionless search and arrest on the basis of an after-the-fact discovery of . . . a parole condition."); *Fitzgerald v. City of Los Angeles*, 485 F. Supp. 2d 1137, 1143 (C.D. Cal. 2007) ("[A]dvance knowledge of a parolee's status is critical to the constitutionality of a suspicionless search of a parolee."). These cases, on which *Caseres* relied, did not hold that officers must have

knowledge of the exact language of a parole condition. Rather, they focused on whether the searching officers had knowledge of a parolee's *status*.

In *Estrella*, we refined the prior knowledge language from *Caseres* to mean that an officer must have both: (1) "probable cause to believe that an individual is on active parole before conducting a suspicionless search," and (2) probable cause to believe that "an applicable parole condition authorizes the search . . . at issue." 69 F.4th at 971–72. We opted for this standard, in lieu of an "actual knowledge" standard, on the basis that the Fourth Amendment "calls for reasonable determinations, and does not demand certainty." *Id.* at 968 (citing *Hill v. California*, 401 U.S. 797, 804 (1971)).

Our decisions in *Caseres* and *Estrella* do not support Payne's proposition that the officers were compelled to follow the special search condition to the letter or that the special search condition served to override the general search condition. Instead, they support the government's position that the general search condition authorized the search of Payne's cell phone. If we were to accept Payne's proposition, it would impose an impractical burden on officers in the field to study a parolee's specific parole conditions before conducting the investigations they deem necessary based on the circumstances with which they are confronted. *See Estrella*, 69 F.4th at 968 (noting that officers cannot be expected to possess "'up-to-the-minute' information of a parolee's status before proceeding with a routine compliance check").

Here, having confirmed Payne's California parole status with the Riverside County Sheriff's dispatch, Officer Coddington was on notice of Payne's general search

condition, which subjected all "property under [Payne's] control" to "search or seizure . . . at any time of the day or night, with or without a search warrant, with or without cause." As a California officer, dealing with a California parolee, he reasonably believed that §§ 3067(b)(3) and 2511(b)(4) authorized him to search Payne, his vehicle, and his belongings, including his cell phone. The search was thus independently justified under Payne's general search condition.

That Payne was also subject to a special electronic device search condition, of which Officer Coddington was also aware, does not place the search of Payne's cell phone outside of the realm of reasonableness, even considering the way Officer Coddington accessed its contents. In *Delrio*, the California Court of Appeal considered the interplay between California's mandatory search conditions and other various special conditions to which a parolee may be subjected. *See People v. Delrio*, 259 Cal. Rptr. 3d 301, 304–09 (Ct. App. 2020). There, the court found that special conditions of California parole, like special condition sixty-four in Payne's case, "do not appear intended to set restrictions on the searches and seizures authorized by Penal Code section 3067, subdivision (b)(3), or to elevate a parolee's expectations of privacy." *Id.* at 308. Instead, the court saw the terms as interposing additional penalties for possible parole violations. *Id.* ("When such special conditions *are* selected, the parolee's failure to adhere may give rise to parole violation charges . . . ."). We agree.

As Payne would have it, CHP officers' only recourse for Payne's refusal to provide his numerical passcode would have been the two options textually set forth in his special parole condition: "arrest pending further investigation and/or confiscation of any device pending investigation."

Payne argues that any officer conduct outside of those measures would be *per se* unreasonable. But so drastically limiting the range of permissible officer conduct based on whether a parolee is subject to a special search condition would lead to bizarre results. Nor do parole search conditions have the strict textual force that Payne suggests they should. *See People v. Schmitz*, 288 P.3d 1259, 1273 (Cal. 2012) (noting that the scope of a parole search is not "strictly tied to the literal wording of the notification given to the parolee upon release"); *Delrio*, 259 Cal. Rptr. 3d at 309 ("[T]he officers who performed the parole search of defendant were not required to first ascertain and parse the language of the [parole] form").

Law enforcement officers in the field can proceed with a search under a parolee's general search condition, assuming that search is reasonable. After all, the California Department of Corrections and Rehabilitation defines special conditions of parole as "rules imposed *in addition* to the general conditions of parole," not in place of those general conditions. *Parole Conditions*, Cal. Dep't of Corrs. & Rehab., https://www.cdcr.ca.gov/parole/parole-conditions/ (last visited Apr. 10, 2024) (emphasis added). These special conditions are imposed based on a parolee's particular offense and criminal history—i.e., aggravating factors—and are designed as a further means by which the department can "discourage criminal behavior." *Id.* It would thus make little sense to hold that Payne's special search condition materially *raised* his expectation of privacy, providing him with a way to shield the contents of his phone from officer inspection by refusing to provide his passcode.

At best, the special condition of Payne's parole created some minimal ambiguity concerning the reach of his parole

conditions in the aggregate. In reviewing suspicionless searches of parolees, the Supreme Court of the United States, the Ninth Circuit, and the Supreme Court of California have often analyzed parole conditions, their clarity, and officers' knowledge of their express terms as factors to consider in a comprehensive reasonableness analysis. For example, in *Samson*, the Supreme Court of the United States found the clear expression of a parole search condition as "salient," but still examined the search under the "totality of the circumstances." *Samson*, 547 U.S. at 852; *see also Knights*, 534 U.S. at 118; *Johnson*, 875 F.3d at 1275; *People v. Sanders*, 73 P.3d 496, 506–07 (Cal. 2003). This totality of the circumstances approach is sound, especially considering that a parole search is an exception to the warrant requirement, well-situated in broader Fourth Amendment jurisprudence. *See, e.g.*, *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). With that approach in mind, we assess "on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Knights*, 534 U.S. at 119 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

Payne's parole status alone subjected him to a significantly diminished expectation of privacy. *See Johnson*, 875 F.3d at 1275. With respect to his cell phone, Payne signed and acknowledged multiple explicit parole search conditions that required him to surrender any device in his vicinity for search without cause. To the extent that Payne's special search condition created an ambiguity over how far his general search condition could sweep, that ambiguity may have marginally increased Payne's expectation of privacy in his cell phone. But any increase based on these facts is *de minimis*. Payne knew he was on

parole. He knew that, based on his parole conditions, all his belongings could be searched at any time, including the contents of his cell phone. Officer Coddington's use of means not specifically contemplated by Payne's special search condition to access a device over which Payne had no significant privacy interest does not appear to have been unreasonable.

The reasonableness of the search is compounded when Payne's diminished privacy interest is weighed against the government's interest in supervising parolees. "[A] State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Samson*, 547 U.S. at 853. The Supreme Court has described this government interest as "overwhelming" based on parolees increased propensity "to commit future criminal offenses." *Id.* (quoting *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 365 (1998)). Here, the State's already significant interest was even greater based on Officer Coddington's knowledge of Payne's assault with a deadly weapon charge, Payne's extreme nervousness during the traffic stop, and Payne's possession of over $1,000 in cash.

Accordingly, we hold that the inclusion of Payne's special search condition did not vitiate the force of his statutorily mandated general search condition, which independently authorized the search at issue in this case. Moreover, we hold that any ambiguity created by the inclusion of the special condition, when factored into the totality of the circumstances, did not increase Payne's expectation of privacy in his cell phone to render the search unreasonable under the Fourth Amendment.

### B

In addition to his unreasonable means argument, Payne claims that the search of his cell phone violated California's prohibition against arbitrary, capricious, or harassing parole searches. Suspicionless parole searches that violate California's prohibition against arbitrary, capricious, or harassing searches are constitutionally unreasonable. *Cervantes*, 859 F.3d at 1183. This prohibition, however, is "decidedly narrow" and only applies to situations where, for example, a search "is based merely on a whim or caprice or when there is no reasonable claim of a legitimate law enforcement purpose." *Estrella*, 69 F.4th at 972 (quoting *People v. Cervantes*, 127 Cal. Rptr. 2d 468, 471 (Ct. App. 2002), as modified (Dec. 23, 2002)).

Payne argues that "[o]nce the officers found nothing illegal on [his] person or in his vehicle, that should have been the end of the matter," but he does not cite to any authority suggesting that an officer's failure to abandon their investigation under these circumstances rises to the level of a violation of the arbitrary, capricious, or harassing standard. Instead, he cites cases involving the automobile exception for the proposition that officers had no reason to search the contents of Payne's phone for evidence of his window tint violation. Those cases, however, are inapposite because officers must have probable cause to conduct a search under the automobile exception to the warrant requirement. Parole searches, on the other hand, require no such probable cause determination as to the place or thing being searched.

Finally, Payne claims that the officers' search of his photos, videos, and maps ran afoul of the Supreme Court's decision in *Riley v. California*, which held that officers could not search the contents of an individual's cell phone as

incident to their arrest.  573 U.S. 373, 401 (2014).  However, we clearly rejected the argument that *Riley* applies to parole searches of a cell phone in *Johnson*.  875 F.3d at 1273–75. We therefore decline to extend *Riley's* reasoning to the facts of this case.

The CHP officers who legitimately stopped Payne did so based on their independent suspicion that Payne had violated California's Vehicle Code.  They proceeded with their investigation logically and appropriately after learning Payne was a California parolee and observing his behavior. Having failed to present any evidence that the CHP officers who stopped Payne and eventually searched his cell phone demonstrated any "arbitrary or oppressive conduct," *Reyes*, 968 P.2d at 451 (citations omitted), we hold that the search of Payne's cell phone was reasonable.[4]

### III

Next, we consider Payne's argument that CHP officers violated his Fifth Amendment privilege against self-incrimination when they compelled him to unlock his cell phone using his fingerprint.  Again, we review the district court's denial of Payne's motion to suppress *de novo*, and its factual findings for clear error.  *Sullivan*, 797 F.3d at 632–33.

Ratified in 1791, the Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  While

---

[4] To the extent that determination required the court to apply facts to law in a way that was "essentially factual," we discern no clear error in the court's conclusion.  *United States v. Franklin*, 18 F.4th 1105, 1115 (9th Cir. 2021) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1259–60 (9th Cir. 2009) (en banc)).

the precise scope of the privilege has, and continues to be, subject to great debate, what has emerged is a three-prong analysis, with each prong representing a standalone inquiry. For a criminal defendant to benefit from the Fifth Amendment privilege, there must be a "communication" at issue that is: (1) compelled; (2) incriminating; and (3) testimonial. *See Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 189 (2004). The government all but concedes that Payne has established the compelled and incriminating prongs of the analysis, so we address them only briefly.

The district court implicitly found that CHP officers compelled Payne to use his thumb to open the device, despite Officer Coddington's attestation that Payne reluctantly opened the device on his own. For the purposes of this appeal, the government has accepted Payne's version of events. Payne averred that, after he refused to give officers his passcode, one of them "grabbed [his] thumb and unlocked the phone." This transpired while Payne was handcuffed and in the back of a patrol vehicle. Compulsion is present for Fifth Amendment purposes when, "considering the totality of the circumstances, the free will of the witness was overborne." *United States v. Anderson*, 79 F.3d 1522, 1526 (9th Cir. 1996) (quoting *United States v. Washington*, 431 U.S. 181, 188 (1977)). Based on Payne's version of events, the use of his thumb to unlock his phone was compelled. He was physically restrained, in the back of a squad car, and had already refused to provide officers with the passcode to unlock the phone. Based on this resistance, CHP officers took matters into their own hands, physically selecting one of Payne's thumbs to unlock the device.

The use of Payne's thumb to unlock his device was also "incriminating." This prong of the Fifth Amendment

analysis has been interpreted to encompass "any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 445 (1972). Here, Payne could have reasonably concluded that giving up his thumbprint, and thereby access to the vast trove of personal information contained on his cell phone, would lead to evidence that could be used against him in a criminal prosecution. Indeed, that is exactly what happened.

The more difficult question is whether the compelled use of Payne's thumb to unlock his phone was testimonial. To date, neither the Supreme Court nor any of our sister circuits have addressed whether the compelled use of a biometric to unlock an electronic device is testimonial. Testimonial communications are those that, "explicitly or implicitly, relate a factual assertion or disclose information." *Doe v. United States*, 487 U.S. 201, 210 (1988). Of course, there are no explicit communications on this record. Payne said nothing when CHP officers used his thumb to unlock his phone. His Fifth Amendment claim thus rests entirely on whether the use of his thumb implicitly related certain facts to officers such that he can avail himself of the privilege against self-incrimination. This argument implicates two lines of Supreme Court precedent: the physical trait cases and the act of production doctrine.

Compelled physical acts—i.e., those that require an individual to serve as a "donor"—are not testimonial. The physical trait cases have addressed circumstances where an individual is compelled to: don a particular piece of clothing, *Holt v. United States*, 218 U.S. 245, 252–53 (1910); stand in a lineup, *United States v. Wade*, 388 U.S. 218, 223 (1967); provide a handwriting or voice exemplar, *Gilbert v. California*, 388 U.S. 263, 266–67 (1967) (handwriting

exemplar); *Wade*, 388 U.S. at 222–23 (1967) (voice exemplar); submit to fingerprinting, *Wade*, 388 U.S. at 223; or have their blood drawn for DUI testing, *Schmerber v. California*, 384 U.S. 757, 761 (1966). Each case reached the same conclusion: not testimonial. In *Schmerber*, for example, the Court recognized that history and lower court precedent made clear that the privilege against self-incrimination was designed to ward off "situations in which the State seeks to . . . obtain[] the evidence against an accused through the cruel, simple expedient of compelling it from his own mouth." *Schmerber*, 384 U.S. at 763 (internal quotation marks omitted). Because the "[p]etitioner's testimonial capacities were in no way implicated" and his "participation, except as a donor, was irrelevant to the results of the test," the Court held that the compelled blood draw was not testimonial under the Fifth Amendment. *Id.* at 765.

On its face, the use of Payne's thumb to unlock his phone appears no different from a blood draw or fingerprinting at booking. These actions do not involve the testimonial capacities of the accused and instead only compel an individual to provide law enforcement with access to an immutable physical characteristic. *See Wade*, 388 U.S. at 222–23. The next step of the investigation depends on the "independent labor of [the state's] officers." *Estelle v. Smith*, 451 U.S. 454, 462 (1981) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 581–82 (1961)). But Payne maintains that the use of his thumb to unlock his phone is fundamentally different from the compelled acts in past physical trait cases, including the fingerprinting discussed in *Schmerber* and *Wade*. *See Schmerber*, 384 U.S. at 764; *Wade*, 388 U.S. at 223. According to Payne, this is because of what the compelled use of his biometric *implicitly*

communicated.  He looks to the act of production doctrine for support.

Under the act of production doctrine, a purely physical act may nonetheless be testimonial because of what it communicates "wholly aside from the contents" of the thing produced. *Fisher v. United States*, 425 U.S. 391, 410 (1976). Although act of production cases have dealt exclusively with responses to document subpoenas, their reasoning applies to other situations.**[5]**  The Supreme Court has reasoned that producing a trove of documents in response to a subpoena may implicitly communicate "the existence of the papers demanded and their possession or control by the [individual]," as well as the individual's "belief that the papers are those described in the subpoena."  *Id.* (citing *Curcio v. United States*, 354 U.S. 118, 125 (1957)).

The act of production doctrine's triggering point becomes clearer upon close reading of the Supreme Court's decisions in *Doe*, 487 U.S. 201, and *United States v. Hubbell*, 530 U.S. 27 (2000).  In *Doe*, the government compelled an individual to "sign 12 forms consenting to disclosure of any bank records respectively relating to 12 foreign bank accounts over which the Government knew or suspected that Doe had control." 487 U.S. at 203.  However, the consent forms did not force Doe to himself collect and

---

[5] The government suggests the doctrine *only* applies to subpoena responses, arguing that there is "no basis to extend that doctrine to the act of biometric unlock."  We are not so sure.  The Supreme Court has stated in its act of production jurisprudence that "[t]he difficult question whether a compelled communication is testimonial for purposes of applying the Fifth Amendment often depends on the facts and circumstances of the particular case."  *Doe*, 487 U.S. at 214–15; *see also Fisher*, 425 U.S. at 410 (noting questions of whether "tacit averments" are testimonial "do not lend themselves to categorical answers").

turn over any documents.  The Court held that this was not a testimonial production, reasoning that the signing of the forms related no information about existence, control, or authenticity of the records that the bank could ultimately be forced to produce.  *Id.* at 215–16.  For these reasons, the consent forms were more akin to producing "a handwriting sample or voice exemplar" because the act was not "compelled to obtain 'any knowledge [the suspect] might have.'"  *Id.* at 217 (quoting *Wade*, 388 U.S. at 222).[6]  The forms only provided the government with "*access to* a potential source of evidence," but locating the evidence itself required "the independent labor of its officers."  *Id.* at 215 (internal quotation marks omitted and emphasis added).

*Hubbell*, on the other hand, involved a "subpoena *duces tecum* calling for the production of 11 categories of documents."  *Hubbell*, 530 U.S. at 31.  The suspect eventually "produced 13,120 pages of documents and records and responded to a series of questions that established that those were all of the documents in his custody or control that were responsive to the commands in the subpoena."  *Id.*  The Court held that this act of production was of a fundamentally different kind than that at issue in *Doe* because it was "unquestionably necessary for respondent to make extensive use of 'the contents of his own mind' in identifying the hundreds of documents responsive to the requests in the subpoena."  *Id.* at 43.  The "assembly of those documents was like telling an inquisitor the

---

[6] Justice Stevens dissented from the majority opinion in *Doe* but introduced an analogy that was central to his majority opinion in *Hubbell*.  He wrote that a defendant "may in some cases be forced to surrender a key to a strongbox containing incriminating documents, but I do not believe he can be compelled to reveal the combination to his wall safe."  *Doe*, 487 U.S. at 219 (Stevens, J. dissenting).

combination to a wall safe, not like being forced to surrender the key to a strongbox." *Id.* (citing *Doe*, 487 U.S. at 210 n.9). Thus, the dividing line between *Doe* and *Hubbell* centers on the mental process involved in a compelled act, and an inquiry into whether that act implicitly communicates the existence, control, or authenticity of potential evidence.

District courts applying *Doe* and *Hubbell* have arrived at different conclusions on the biometric unlock question. Payne relies heavily on a Northern District of California case that held forced biometric unlocks violate the Fifth Amendment. *In re Residence in Oakland, Cal.*, 354 F. Supp. 3d 1010 (N.D. Cal. 2019) [hereinafter *Oakland*]. There, a magistrate judge determined the act of production doctrine applied for two primary reasons. First, because compelling an individual to unlock a device with a biometric identifier is the functional equivalent of compelling that person to turn over their alphanumeric passcode, an act that *is* generally accepted to be protected by the Fifth Amendment because it requires an individual to divulge the contents of his mind. *Id.* at 1015–16 ("[I]f a person cannot be compelled to provide a passcode because it is a testimonial communication, a person cannot be compelled to provide one's finger, thumb, iris, face, or other biometric feature to unlock that same device."). Second, because the act instantly concedes "that the phone was in the possession and control of the suspect, and authenticates ownership or access to the phone and all of its digital contents." *Id.* at 1016. Other district courts have come to similar conclusions. *See, e.g.*, *United States v. Wright*, 431 F. Supp. 3d 1175, 1187–88 (D. Nev. 2020); *In re Single-Family Home & Attached Garage*, No. 17 M 85, 2017 WL 4563870, at *7 (N.D. Ill. Feb. 21, 2017).

Still other district courts have come to the opposite result.  Addressing the *Oakland* court's reasoning, these cases assert that whether a passcode and a fingerprint unlock are functional equivalents is an observation with no legal significance to the Fifth Amendment analysis.  *See In re Search Warrant No. 5165*, 470 F. Supp. 3d 715, 734 (E.D. Ky. 2020) ("The Court stands by the unambiguous distinction in both the law and common sense between something intangibly held in the most sacred of places—one's own mind—and an immutable physical characteristic.").  Moreover, responding to the argument that "if the device unlocks, then the incriminating inference is that the person had possession or control of the device," these courts note that such a line of analysis improperly conflates the incrimination prong with the testimonial prong.  *See In re Search Warrant Application for [redacted text]*, 279 F. Supp. 3d 800, 805 (N.D. Ill. 2017).  They ultimately conclude that biometric unlock cases are no different than other physical trait cases, like subjecting an individual to fingerprinting or drawing a person's blood, because the acts at issue "do not themselves communicate anything."  *Id.*[7]

In Payne's case, the Fifth Amendment question stemming from the compelled use of his thumb to unlock his phone bears striking resemblance to Justice Stevens' key vs. combination analogy.  While providing law enforcement officers with a combination to a safe or passcode to a phone would require an individual to divulge the "contents of his

---

[7] State courts are equally split on the issue.  *Compare, e.g.*, *State v. Pittman*, 479 P.3d 1028, 1040–43 (Or. 2021) (unlocking phone using biometrics is testimonial), *with State v. Diamond*, 905 N.W.2d 870, 874–78 (Minn. 2018) (unlocking phone using biometrics is not testimonial); *People v. Ramirez*, 316 Cal. Rptr. 3d 520, 544–50 (Ct. App. 2023) (same).

own mind," turning over a key to a safe or a thumb to unlock a phone requires no such mental process. *Hubbell*, 530 U.S. at 43. To say that a passcode and a biometric are equivalents and thus cannot receive different treatment under the law is a syllogistic fallacy. The logic goes: biometrics are the equivalent of or a substitute for a passcode and passcodes are protected under the Fifth Amendment, so, biometrics are also protected under the Fifth Amendment. The flaw lies in the fact that the Supreme Court has framed the question around whether a particular action requires a defendant to divulge the contents of his mind, not whether two actions yield the same result. *See Hubbell*, 530 U.S. at 43. The functional equivalent argument attempts to make an end run around this central piece of the Fifth Amendment inquiry. When Officer Coddington used Payne's thumb to unlock his phone—which he could have accomplished even if Payne had been unconscious—he did not intrude on the contents of Payne's mind.

While we find the fact that there was no "cognitive exertion" on Payne's part most determinative, *In re Search of [redacted] Washington, D.C.*, 317 F. Supp. 3d 523, 538 (D.D.C. 2018), the relative level of existence, control, and authentication established through a biometric unlock compared to a comprehensive response to a subpoena is also instructive. *See Hubbell*, 530 U.S. at 43. Payne concedes that "the use of biometrics to open an electronic device is akin to providing a physical key to a safe," but argues it is nonetheless a testimonial act because it "simultaneously confirm[s] ownership and authentication of its contents." However, Payne was never compelled to acknowledge the existence of any incriminating information. He merely had to provide access to a source of potential information, just as was the case in *Doe* and *Schmerber*. *See Doe*, 487 U.S. at

215; *Schmerber*, 384 U.S. at 765. The officers were left to identify any incriminating evidence through their own investigation. This is decidedly unlike *Hubbell*, where the subpoena respondent was implicitly conceding the "existence, authenticity, and custody" of specific documents that prosecutors could use in building its case against the respondent. *Hubbell*, 530 U.S. at 41–42.

One can imagine how Payne's case might alternatively fit more neatly in the *Hubbell* framework. For example, had officers somehow compelled Payne to cull through the information in his phone and produce any photos or videos that demonstrated his participation in fentanyl trafficking, there may have been a testimonial act of production. Turning over those photos or videos would implicitly concede that Payne had such videos, that they depicted what the officers were looking for, and that they related to his specific activities. Obviously, that is not the case here.

The Supreme Court has also observed that implicit authentication is the "prevailing justification" for extending Fifth Amendment protection to acts of documentary production because responding to a subpoena may be akin to requiring a suspect to "implicitly testif[y] that the evidence he brings forth is in fact the evidence demanded." *Fisher*, 425 U.S. at 412 n.12 (internal quotations omitted) (quoting *Couch v. United States*, 409 U.S. 322, 346 (1973) (Marshall, J., dissenting)). But "[t]he fact that an individual is able to unlock a phone with a physical characteristic does not automatically make each individual set of data, such as photos, videos . . . immediately authentic." *In re Search Warrant Application for the Cellular Telephone in United States v. Barrera*, 415 F. Supp. 3d 832, 841 (N.D. Ill. 2019). Authentication is not established in the same way here compared to a response to a subpoena where the respondent

is essentially stating the "item is what the proponent claims it is." *Id.* (quoting Fed. R. Evid. 901(a)). Phones like Payne's "can often be programmed to use multiple individuals' biometrics." *In re Search Warrant No. 5165*, 470 F. Supp. 3d at 733. While the fact that Payne's thumb unlocked the phone proved to be incriminating, it alone certainly did not serve to authenticate all the phone's contents.

To the extent Payne relies on the *Oakland* court's attempt to distinguish biometric unlocks from "requiring a suspect to submit to fingerprinting" because it immediately results in access to more physical evidence and "there is no comparison . . . required to confirm a positive match," this line of analysis conflates what is incriminating with what is testimonial. *Oakland*, 354 F. Supp. 3d at 1016; *see Doe*, 487 U.S. at 210 ("[C]ertain acts, though incriminating, are not within the privilege."). All physical trait cases have dealt with compelled acts eventually leading to incriminating evidence that can be used in a suspect's prosecution. *See In re Search Warrant Application for [redacted text]*, 279 F. Supp. 3d at 805 (noting the "distinction—between whether an act is testimonial versus whether the act is incriminating—explains why physical characteristics, like fingerprints, blood samples, handwriting, and so on are not protected by the privilege even though they often are highly incriminating"). The compelled use of an individual's thumb to unlock a device shares many of the same incriminating inferences as comparing a suspect's thumbprint to a thumbprint lifted from a murder weapon. The time it takes to make the connection, or the amount of incriminating information that flows from the nontestimonial act, is of little consequence.

Accordingly, we hold that the compelled use of Payne's thumb to unlock his phone (which he had already identified for the officers) required no cognitive exertion, placing it firmly in the same category as a blood draw or fingerprint taken at booking. The act itself merely provided CHP with access to a source of potential information, much like the consent directive in *Doe*. The considerations regarding existence, control, and authentication that were present in *Hubbell* are absent or, at a minimum, significantly less compelling in this case. Accordingly, under the current binding Supreme Court framework, the use of Payne's thumb to unlock his phone was not a testimonial act and the Fifth Amendment does not apply.[8]

We would be remiss not to mention that Fifth Amendment questions like this one are highly fact dependent and the line between what is testimonial and what is not is particularly fine. Our opinion should not be read to extend to *all* instances where a biometric is used to unlock an electronic device. Indeed, the outcome on the testimonial prong may have been different had Officer Coddington required Payne to independently select the finger that he placed on the phone. *See In re Search Warrant Application for [redacted text]*, 279 F. Supp. 3d at 804 (discussing how

---

[8] Payne argues that the Supreme Court's decision in *Riley* supports a different result because there the Court recognized that modern technological advances like the use of smart phones may require reexamination of certain privacy principles. 573 U.S. at 403. But *Riley* analyzed cell phone searches under the Fourth Amendment, which calls for a reasonableness analysis. *See In re Search Warrant Application for [redacted text]*, 279 F. Supp. 3d at 806. The Fifth Amendment demands no such reasonableness inquiry. The narrow question before us is whether the compelled use of Payne's thumb is testimonial. Existing Supreme Court precedent provides the necessary tools to answer that question.

a suspect would be required to engage in some thought process if the government compels them to "decide which finger (or fingers) to apply" to a sensor). And if that were the case, we may have had to grapple with the so-called foregone conclusion doctrine. *See Fisher*, 425 U.S. at 411. We mention these possibilities not to opine on the right result in those future cases, but only to demonstrate the complex nature of the inquiry.

IV

Having determined that the search of Payne's cell phone did not violate the Fourth or Fifth Amendment, Payne's argument that the evidence seized from El Cortez Way must be suppressed as "fruit of the poisonous tree" fails.

Next, Payne contends that the pre-warrant search of the house on El Cortez Way independently violated his Fourth Amendment rights. The government offers three possible reasons why either the pre-warrant search was legal, or the constitutionality of the pre-warrant search is immaterial to the outcome of this case. First, it claims the search was valid pursuant to Payne's parole conditions. Second, it claims that the search warrant CHP officers eventually obtained was valid notwithstanding the constitutionality of the pre-warrant search. Third, it claims that even if the search warrant was invalid, the good faith exception to the exclusionary rule applies. We agree with the government's second argument and, thus, do not address its first or third.

We review the district court's denial of Payne's motion to suppress *de novo* and can affirm on any basis the record supports. *United States v. Ruiz*, 428 F.3d 877, 880 (9th Cir. 2005).

When a search warrant application includes "illegally obtained information," a reviewing court must determine whether the warrant was supported by probable cause after "properly purg[ing] the affidavit of the offending facts." *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001). Here, the district court held that "when you eliminate the facts uncovered during the sweep, the warrant contained probable cause." In his reply brief, Payne expressly conceded that he "agrees with the government . . . that the information from his phone likely would have been sufficient for probable cause even without the information garnered during the illegal protective sweep." We agree.

Assuming without deciding that the pre-warrant sweep of El Cortez Way violated Payne's Fourth Amendment rights, whether the warrant CHP officers obtained was supported by probable cause —i.e., a "probability or substantial chance of criminal activity"—depends on the facts included in the warrant application that CHP officers knew *before* the sweep. *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018). These included: (1) Payne was extremely nervous, sweating profusely, and fumbling for his documents when he was initially pulled over; (2) Payne confirmed that he was on parole; (3) a search of Payne's cell phone showed a video depicting a large amount of cash, a money-counting machine, and several bags of what officers suspected to be fentanyl; (4) a separate video from Payne's phone showed the outside of the home on El Cortez Way; (5) the map application on Payne's phone showed a pin to a parked vehicle outside a residence on El Cortez Way; and (6) upon driving to the location on El Cortez Way, Officer Coddington observed a silver BMW, confirmed it was registered to Payne, and was able to unlock the vehicle using the key seized from Payne's person.

As Payne acknowledges in his reply brief, these facts go well beyond establishing probable cause to believe that a search of the house would uncover evidence of criminal drug possession and trafficking. Thus, the search warrant was valid even after excising the facts included in the application from the pre-warrant protective sweep. The district court rightfully denied Payne's motion to suppress.

## CONCLUSION

We **AFFIRM** the denial of Payne's motion to suppress.